**FILED**

February 09, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

BY: _____pg_____
DEPUTY

| | |
|---|---|
| *IN RE ESO SOLUTIONS, INC. BREACH LITIGATION*<br><br><br><br>This Document Relates To: All Plaintiffs | Master File No. 1:23-cv-01557-RP |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Steven Guiffre, Billy Love, George Simpson, Jamie Thomas, Deborah Todd, and Robert Day ("Plaintiffs"), individually and on behalf of all others similarly situated persons, allege the following against ESO Solutions, Inc. ("ESO" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, amongst other things, investigation by their counsel and review of public documents, as to all matters:

## NATURE OF THE ACTION

1.      This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from ESO's failure to implement reasonable and industry standard data security practices.

2.      Defendant is a corporation that "provides software services that help hospitals and healthcare systems improve operations, quality, and patient outcomes."[1]

---

[1] *See* Letter to Maine Attorney General dated Dec. 19, 2023 ("Notice Letter"), a sample copy of which is available at https://apps.web.maine.gov/online/aeviewer/ME/40/bd939a31-70fd-4f7c-99cf-d6b87906489f.shtml

3.      Plaintiffs bring this Complaint against Defendant for its failure to properly secure and safeguard the sensitive information that it collected and maintained as part of its regular business practices, including, but not limited to: medical treatment information, which is protected health information ("PHI"), as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as well as names, phone numbers, addresses, and, in some cases, Social Security numbers ("personally identifying information" or "PII" and collectively with PHI, "Private Information").

4.      Upon information and belief, former and current patients at ESO's clients are required to entrust Defendant with sensitive, non-public Private Information, without which Defendant could not perform its regular business activities, in order to obtain medical services from Defendant's clients. Defendant retains this information for many years and even after the relationship has ended.

5.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.      According to the Notice of Data Incident letter that Defendant sent to Plaintiffs and other impacted Class Members (the "Notice Letter") Defendant, on September 28, 2023, "detected and stopped a sophisticated ransomware incident, in which an unauthorized third party accessed and encrypted some of ESO's computer systems."[2] In response, Defendant "engaged third-party forensic specialists to assist [ESO] with investigating the extent of any unauthorized activity."[3] As

---

[2] *Id.*

[3] *Id.*

a result of its investigation, Defendant concluded that "the unauthorized third party may have acquired [Plaintiffs' and Class Members'] personal data during this incident."[4]

7.    Defendant's investigation concluded that the Private Information compromised in the Data Breach included Plaintiffs' and approximately 2,700,000 other individuals' information.[5]

8.    Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect its clients' patients' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.    In breaching its duties to properly safeguard its clients' patients' Private Information and give its clients' patients timely, adequate notice of the Data Breach's occurrence, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

10.    Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and

---

[4] *Id.*

[5] https://apps.web.maine.gov/online/aeviewer/ME/40/bd939a31-70fd-4f7c-99cf-d6b87906489f.shtml

incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

11.    Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.    Therefore, Plaintiffs and Class Members have suffered and are at a present and continuing risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

13.    Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

14.    Plaintiff Steven Guiffre is, and at all relevant times has been, a resident and citizen of Sayville, New York.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant,

dated December 12, 2023.

15.    Plaintiff George Simpson is, and at all relevant times has been, a resident and citizen of Winter Park, Florida.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated January 10, 2024.

16.    Plaintiff Billy Love is, and at all relevant times has been, a resident and citizen of Mooresboro, North Carolina.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated December 12, 2023.

17.    Plaintiff Deborah Todd is, and at all relevant times has been, a resident and citizen of Alexandria, Virginia.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated December 12, 2023.

18.    Plaintiff Jamie Thomas is, and at all relevant times has been, a resident and citizen of Kings Mountain, North Carolina.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated December 12, 2023.

19.    Plaintiff Robert Day is, and at all relevant times has been, a resident and citizen of Roundrock, Texas.  Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated December 20, 2023.

20.    Defendant ESO Solutions, Inc. is a corporation formed under the state laws of Texas, with its principal place of business located in Austin, Texas. It is a citizen of the state of Texas.

**JURISDICTION AND VENUE**

21.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and

minimal diversity exists because many putative class members, including several Plaintiffs, are citizens of a different state than Defendant. Defendant is a Texas Corporation and a citizen of Texas. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

22.    This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in the Austin Division of the Western District of Texas. Its principal place of business is located at 11500 Alterra Parkway, Suite 100, Austin, Texas 78758.

23.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendant's principal place of business is located in this District; Defendant maintains Class Members' Private Information in this District; and Defendant caused harm to Class Members residing in this District.

## STATEMENT OF FACTS

### *Defendant's Business*

24.    Defendant is a corporation that "provides software services that help hospitals and healthcare systems improve operations, quality, and patient outcomes."[6]

25.    In order to obtain medical services from Defendant's clients, Defendant requires its clients' patients to provide sensitive and confidential Private Information, including their names, addresses, phone numbers, Social Security numbers, PHI, and other sensitive information.

26.    The information held by Defendant in its computer systems included the unencrypted Private Information of Plaintiffs and Class Members.

27.    Upon information and belief, Defendant made promises and representations to its clients' patients that the Private Information collected from them as a condition of obtaining

---

[6] Notice Letter, *supra* note 1.

medical services at ESO's clients would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

28.    Indeed, Defendant provides on its website that: "ESO is committed to protecting the security of your personal information. We use a variety of industry-standard security technologies and procedures to help protect your personal information from unauthorized access, use, or disclosure."[7]

29.    Plaintiffs and Class Members provided their Private Information, directly or indirectly, to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

30.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

31.    Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep its clients' patients' Private Information safe and confidential.

---

[7] https://www.eso.com/privacy-policy/

32.    Defendant had obligations created by the FTC Act, HIPAA, contract, and industry standards, to keep its clients' patients' Private Information confidential and to protect it from unauthorized access and disclosure.

33.    Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

34.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

***The Data Breach***

35.    On or about December 12, 2023, Defendant began sending Plaintiffs and other victims of the Data Breach the Notice Letter, informing them, in relevant part, that:

**<u>What Happened</u>**
On September 28, 2023, we detected and stopped a sophisticated ransomware incident, in which an unauthorized third party accessed and encrypted some of ESO's computer systems. We immediately took the affected systems offline, secured our network environment, and engaged third-party forensic specialists to assist us with investigating the extent of any unauthorized activity.

Our investigation determined that the unauthorized third party may have acquired your personal data during this incident. Please know that we have taken all reasonable steps to prevent your data from being further published or distributed, have notified and are working with federal law enforcement to investigate.

On October 23, 2023, we determined that your personal and patient information was located on one of the impacted systems. While we have found no evidence that your information has been misused, we are notifying you of this incident and offering you the resources provided in this letter, in an abundance of caution and so that you can take precautionary steps to help protect yourself, should you wish to do so. ESO recommends that you proceed with caution, and take advantage of the resources provided in this letter.

**What Information Was Involved**

At present there is no evidence that any of your personal information has been misused; however, the impacted data may have contained your personal information, including your name, social security number, phone number, address, and medical treatment information. Additionally, it is possible that the following protected health information fields could have been accessed: patient account and/or medical record number, injury and diagnosis information, procedure type (if applicable), insurance and payer information, and other items found in your registry file. At this time, we do not have evidence that your information has been misused.[8]

36.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

37.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

38.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

39.     The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including their names, Social Security numbers (in some cases), PHI, and other sensitive information. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

---

[8] Notice Letter, *supra* note 1.

40.     Plaintiffs further believe that their Private Information and that of Class Members was or will be sold on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

41.     A ransomware attack is a type of cyberattack that is frequently used to target healthcare providers due to the sensitive patient data they maintain.[9] In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network.[10] Ransomware attacks are particularly harmful for patients and healthcare providers alike as they cause operational disruptions that result in lengthier patient stays, delayed procedures or test results, increased complications from surgery, and even increased mortality rates.[11] In 2021, 44% of healthcare providers who experienced a ransomware attack saw their operations disrupted for up to a week and 25% experienced disrupted services for up to a month.[12]

42.     Companies should treat ransomware attacks as any other data breach incident because ransomware attacks do not just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[13]    As

---

[9] *Ransomware warning: Now attacks are stealing data as well as encrypting it*, available at https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/

[10] *Ransomware FAQs*, available at https://www.cisa.gov/stopransomware/ransomware-faqs

[11] *Ponemon study finds link between ransomware, increased mortality rate*, available at https://www.healthcareitnews.com/news/ponemon-study-finds-link-between-ransomware-increased-mortality-rate

[12] *The State of Ransomware in Healthcare 2022*, available at https://assets.sophos.com/X24WTUEQ/at/4wxp262kpf84t3bxf32wrctm/sophos-state-of-ransomware-healthcare-2022-wp.pdf

[13] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence [...] the initial assumption should be that data may have been exfiltrated."

43.    An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[14] In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[15] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[16] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[17]

### Data Breaches Are Preventable

44.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[18]

45.    To prevent and detect ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

---

[14] *The chance of data being stolen in a ransomware attack is greater than one in ten*, available at https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[15] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

[16] *Id.*

[17] *Id.*

[18] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[19]

46.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

### Secure internet-facing assets

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

### Thoroughly investigate and remediate alerts

- Prioritize and treat commodity malware infections as potential full compromises;

### Include IT Pros in security discussions

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

### Build credential hygiene

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

### Apply principle of least-privilege

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

### Harden infrastructure

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection

---

[19] *Id.* at 3-4.

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[20]

47.    Given that Defendant was storing the sensitive Private Information of its clients' current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

48.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of over two million individuals, including that of Plaintiffs and Class Members.

### Defendant Acquires, Collects, & Stores Plaintiffs' and Class Members' Private Information

49.    As a condition to obtain medical services from Defendant's clients, Defendant requires its clients' patients to give their sensitive and confidential Private Information to Defendant.

50.    Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform its services.

51.    By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

52.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private

---

[20] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

53.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

54.     Upon information and belief, Defendant made promises to its clients' patients that it would maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

55.     Indeed, Defendant provides on its website that: "ESO is committed to protecting the security of your personal information. We use a variety of industry-standard security technologies and procedures to help protect your personal information from unauthorized access, use, or disclosure."[21]

56.     Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### Defendant Knew, or Should Have Known, of the Risk Because Software Companies in Possession of Private Information are Particularly Susceptible to Cyberattacks

57.     Data thieves regularly target companies like Defendant's due to the highly sensitive information for which they are custodians. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

58.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting software companies that collect

---

[21] https://www.eso.com/privacy-policy/

and store Private Information and other sensitive information, like Defendant, preceding the date of the breach.

59.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[22]

60.     In light of recent high profile cybersecurity incidents at other healthcare provider and healthcare support companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

61.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[23]

---

[22] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/
[23] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

62.    Additionally, as companies became more dependent on computer systems to run their business,[24] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[25]

63.    Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

64.    As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

65.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

66.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially over two million individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[24]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

[25]https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

67.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

68.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen— particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

69.     As a software company in possession of its clients' patients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

***Value of Private Information***

70.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[26] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[27]

---

[26] 17 C.F.R. § 248.201 (2013).

[27] *Id.*

71.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[28]

72.     For example, Private Information can be sold at a price ranging from $40 to $200.[29] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[30]

73.     Social Security numbers, which were compromised for some of the Class Members, for example, are among the worst kinds of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[31]

74.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and

---

[28] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[29] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[30] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[31] https://www.ssa.gov/pubs/EN-05-10064.pdf

evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

75.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

76.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[32]

77.     The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

---

[32]     *Medical I.D. Theft*, EFraudPrevention    https://efraudprevention.net/home/education/?a =187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected.

78.     Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[33] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[34] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[35]

79.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[36]

80.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[37]

81.     A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[38] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-

---

[33] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/

[34] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/

[35] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches/

[36] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content

[37] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/

[38] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/

third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[39]

82.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, Social Security numbers, and PHI.

83.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[40]

84.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

85.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may

---

[39] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One, Id,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/

[40] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015), *available at:* https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

86.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### Defendant Fails to Comply with FTC Guidelines

87.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

88.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[42]

89.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone

---

[41] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

[42] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[43]

90.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

91.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

92.    These FTC enforcement actions include actions against companies like Defendant.

93.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

94.    Defendant failed to properly implement basic data security practices.

95.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its clients' patients' Private Information or to comply with

---

[43] *Id.*

applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

96.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its clients' patients, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendant Fails to Comply with HIPAA Guidelines*

97.     Defendant is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

98.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[44] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

99.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

---

[44] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

100.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

101.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

102.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

103.    HIPAA's Security Rule requires Defendant to do the following:

  a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

  b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

  c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

  d.    Ensure compliance by its workforce.

104.    HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to

those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

105.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

106.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[45]

107.    HIPAA requires a business associate to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the business associate or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

108.    HIPAA requires a business associate to mitigate, to the extent practicable, any harmful effect that is known to the business associate of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

109.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed

---

[45]    Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[46] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[47]

### *Defendant Fails to Comply with Industry Standards*

110.    As noted above, experts studying cybersecurity routinely identify software companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

111.    Several best practices have been identified that, at a minimum, should be implemented by software companies in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

---

[46] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[47] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html.

112.    Other best cybersecurity practices that are standard in the software industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

113.    Upon information and belief Defendant failed to meet the minimum standards of one or more of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

114.    These foregoing frameworks are existing and applicable industry standards in the software industry, and upon information and belief, Defendant failed to comply with at least one– –or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**COMMON INJURIES & DAMAGES**

115.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to

mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continuing risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

### *The Data Breach Increases Plaintiffs' & Class Members' Risk of Identity Theft*

116.    The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

117.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

118.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

119.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

120.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[48]

121.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

122.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[48] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/

123.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

124.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

125.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

126.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – however, in doing so the resource and asset of time has been lost.  This personal time is both necessary and, importantly, uncompensated.

127.    Thus, due to the actual and imminent risk of identity theft, Defendant instructs, in its Notice Letter, Plaintiffs and Class Members to take the following measures to protect themselves: "[w]e encourage you to remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[.]"[49]

128.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data

---

[49] Notice Letter, *supra* note 1.

Breach, contacting ESO to obtain more information about the Data Breach's occurrence, contacting financial institutions to sort out fraudulent charges on their accounts, and replacing impacted credit cards.

129.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[50]

130.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[51]

131.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[52]

---

[50] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[51] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[52] *Supra* note 50.

***Diminution of Value of PII and PHI***

132.    PII and PHI are valuable property rights. Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.[53]

133.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[54]

134.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[55,]

135.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[56]

136.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[57]

137.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and

---

[53] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *1 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[54] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[55] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[56] https://datacoup.com/

[57] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

138.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

139.    The fraudulent activity resulting from the Data Breach may not come to light for years.

140.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

141.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially over two million individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

142.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

143.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

144.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

145.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

146.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost for monitoring to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### *Loss of Benefit of the Bargain*

147.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to obtain medical services at Defendant's clients under certain terms, Plaintiffs and other reasonable patients understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received

medical services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

### *Plaintiff Steven Guiffre's Experience*

148.    Upon information and belief, Plaintiff Guiffre is unaware of how Defendant obtained his private information; however, it is likely that Defendant obtained Plaintiff Guiffre's information from some medical provider Plaintiff Guiffre visited prior to the Data Breach.

149.    As a condition of obtaining medical services from ESO's client, Plaintiff Guiffre was required to provide Defendant, directly or indirectly, with his Private Information, including his name, address, phone number, and other sensitive information.

150.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Guiffre's Private Information in its system.

151.    Plaintiff Guiffre is very careful about sharing his sensitive Private Information. Plaintiff Guiffre stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

152.    Plaintiff Guiffre received the Notice Letter, by U.S. mail, directly from Defendant, dated December 12, 2023, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

153.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Guiffre to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Guiffre made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:

researching and verifying the legitimacy of the Data Breach, communicating with his financial and insurance services providers to alert them of the breach and learn more about precautions he can take, and changing account passwords for all of his accounts tied to sensitive personal information. Plaintiff Guiffre has spent significant time on activities in response to the Data Breach—such as spending 15 to 20 hours of his time going through his bank statements and financial accounts for fraudulent charges. This includes traveling to the bank to re-affirm to them that if anything occurs, then he needed to be called immediately. All of this personal time was uncompensated. Plaintiff Guiffre has therefore also experienced significant out of pocket expenses, in the form of travel expenses to and from the bank. This is valuable time that Plaintiff Guiffre otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

154.    Plaintiff Guiffre suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continuing risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

155.    Plaintiff Guiffre also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. Recently, Plaintiff Guiffre received a call from a blocked number and he was asked questions regarding his trust fund, specifically involving his accounts, balances, and access to those accounts. Plaintiff Guiffre knows this call was fraudulent and an attempt to obtain further information from him, as Plaintiff Guiffre knows his trust fund account is very secure and such questions would not be asked of him by his trustee.

156.    The Data Breach has caused Plaintiff Guiffre to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

157.    As a result of the Data Breach, Plaintiff Guiffre anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

158.    As a result of the Data Breach, Plaintiff Guiffre is at a present risk and will continue to be at risk of identity theft and fraud for years to come. Plaintiff Guiffre has also been notified of his information being found on the dark web by Equifax credit monitoring services.

159.    Plaintiff Guiffre has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Billy Love's Experience***

160.    Upon Information and belief, Defendant obtained Plaintiff Love's private information through a contract with a medical service provider from whom Plaintiff has received care.

161.    As a condition of obtaining medical services from ESO's client, Plaintiff Love was required to provide Defendant, directly or indirectly, with Private Information, including his name, address, phone number, and other sensitive information. Plaintiff was a patient at CaroMont Health from 2020 to 2023, and he believes that his information was compromised through that provider.

162.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Love's Private Information in its system. In addition, potentially his patient account, medical record number, injury, diagnosis information, procedure type, insurance and payer information, amongst other items in his registry file.

163.    Plaintiff Love is very careful about sharing his sensitive Private Information. Plaintiff Love stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

164.    Plaintiff Love received the Notice Letter, by U.S. mail, directly from Defendant, dated December 12, 2023, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

165.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Love to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Love made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, signing up for the free credit monitoring with Kroll offered by defendant, communicating with his financial and insurance services providers to alert them of the breach and learn more about precautions he can take, and

changing account passwords for all of his accounts tied to sensitive personal information. Plaintiff Love has spent significant time on activities in response to the Data Breach—valuable time Plaintiff Love otherwise would have spent on other activities, including but not limited to work and/or recreation. This uncompensated time has been lost forever and cannot be recaptured.

166.    Plaintiff Love suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continued increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

167.    Plaintiff Love also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. Since around October and November of 2023, Plaintiff Love has experienced an increase in spam emails, spam social media direct messages, targeted finance ads, and ads from providers of certain services.

168.    The Data Breach has caused Plaintiff Love to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details

about the Data Breach's occurrence. Plaintiff Love is very worried as he is having to spend time looking through his accounts, which is incredibly time consuming.

169.    As a result of the Data Breach, Plaintiff Love anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

170.    As a result of the Data Breach, Plaintiff Love is at a present risk and will continue to be at risk of identity theft and fraud for years to come.

171.    Plaintiff Love has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff George Simpson's Experience

172.    Upon information and belief, Defendant obtained Plaintiff Simpson's private information through a contract with a medical service provider from whom Plaintiff has received care. Around 2017 or 2018, Plaintiff received medical service in the form of an emergency surgery.

173.    As a condition of obtaining medical services from ESO's client, Plaintiff Simpson was required to provide Defendant, directly or indirectly, with his Private Information, including his name, address, phone number, and other sensitive information.

174.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Simpson's Private Information in its system.

175.    Plaintiff Simpson is very careful about sharing his sensitive Private Information. Plaintiff Simpson stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

176.    Plaintiff Simpson received the Notice Letter, by U.S. mail, directly from Defendant, dated January 10, 2024, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

177.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Simpson to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Simpson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, communicating with his financial and insurance services providers to alert them of the breach and learn more about precautions he can take, and changing account passwords for all of his accounts tied to sensitive personal information. Plaintiff Simpson has spent significant uncompensated time on activities in response to the Data Breach— such as spending eight (8) hours reviewing his bank statements and financial accounts for fraudulent charges. Plaintiff Simpson utilizes Experian credit monitoring service offered from a previous breach and his accounts are frozen. Plaintiff Simpson signed up for the free credit monitoring service with Kroll that was offered by Defendant. Thus, Plaintiff Simpson has spent considerable amounts of valuable time that he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

178.    Plaintiff Simpson suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the

Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continuing risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

179.    Plaintiff Simpson also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

180.    The Data Breach has caused Plaintiff Simpson to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed his of key details about the Data Breach's occurrence. Plaintiff Simpson is experiencing a lot of stress due to his information being in the hands of cybercriminals and he has a high level of anxiety because of the Data Breach.

181.    As a result of the Data Breach, Plaintiff Simpson anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

182.    As a result of the Data Breach, Plaintiff Simpson is at a present risk and will continue to be at risk of identity theft and fraud for years to come.

183.    Plaintiff Simpson has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Jamie Thomas's Experience*

184.    Upon Information and belief, Defendant obtained Plaintiff Jamie Thomas's Private Information through a contract with a medical service provider from whom Plaintiff Thomas has received care. Plaintiff Thomas has been in various hospitals and believes this is how Defendant obtained her Private Information.

185.    As a condition of obtaining medical services from ESO's client, Plaintiff Thomas was required to provide Defendant, directly or indirectly, with her Private Information, including her name, address, phone number, and other sensitive information.

186.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Thomas's Private Information in its system.

187.    Plaintiff Thomas is very careful about sharing her sensitive Private Information. Plaintiff Thomas stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

188.    Plaintiff Thomas received the Notice Letter, by U.S. mail, directly from Defendant, dated December 12, 2023, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

189.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Thomas to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Thomas made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, signing up for the free credit

monitoring service provided by Defendant, putting in place a credit freeze, communicating with her financial and insurance services providers to alert them of the breach and learn more about precautions she can take, placing a freeze on her credit report, and changing account passwords for all of her accounts tied to sensitive personal information. Plaintiff Thomas has spent significant time on activities in response to the Data Breach—such as reviewing her financial information from September 28, 2023, to present day. Plaintiff Thomas has spent uncompensated time reviewing her financial accounts of about thirty minutes to an hour a day. Thus, Plaintiff Thomas has spent considerable amounts of valuable time that she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

190.    Plaintiff Thomas suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continuing risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

191.    Plaintiff Thomas also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

192.    As a result of the Data Breach, Plaintiff Thomas anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

193.    As a result of the Data Breach, Plaintiff Thomas is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

194.    Plaintiff Thomas has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Deborah Todd's Experience***

195.    Upon Information and belief, Defendant obtained Plaintiff Todd's private information through a contract with a medical service provider from whom Plaintiff has received care. Plaintiff Todd had to go to Virginia Hospital ER three times before an operation.

196.    As a condition of obtaining medical services from ESO's client, Plaintiff Todd was required to provide Defendant, directly or indirectly, with her Private Information, including her name, address, phone number, and other sensitive information.

197.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Todd's Private Information in its system.

198.    Plaintiff Todd is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

199.    Plaintiff Todd received the Notice Letter, by U.S. mail, directly from Defendant, dated December 12, 2023, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

200.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Todd to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Todd made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, communicating with her financial and insurance services providers to alert them of the breach and learn more about precautions she can take, and changing account passwords for all of her accounts tied to sensitive personal information. Plaintiff Todd has spent significant uncompensated time on activities in response to the Data Breach— such as canceling her Amazon account due to a fraudulent charge. Plaintiff Todd has spent time searching for fraudulent charges on her bank statements and financial accounts. Thus, this is valuable time that the Plaintiff Todd otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

201.    Plaintiff Todd suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii)

nominal damages; and (ix) the present and continuing risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

202.    Plaintiff Todd also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

203.    Plaintiff Todd also suffered actual injury in the form of fraud and identity theft when unauthorized and unknown third parties made unauthorized, and fraudulent, charges to her Amazon account.

204.    The Data Breach has caused Plaintiff Todd to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

205.    As a result of the Data Breach, Plaintiff Todd anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

206.    As a result of the Data Breach, Plaintiff Todd is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. Plaintiff Todd's credit monitoring service, Norton Lifelock, has alerted her that her name, email, and phone number was on the dark web in the months before she was in receipt of the data breach letter.

207.    Plaintiff Todd has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Robert Day's Experience***

208.    Upon Information and belief, Defendant obtained Plaintiff Day's private information through a contract with a medical service provider from whom Plaintiff Day has received care. Plaintiff Day has visited doctors at Ascension Seton Williamson Hospital, an Austin Regional Clinic, for the past few years.

209.    As a condition of obtaining medical services from ESO's client, Plaintiff Day was required to provide Defendant, directly or indirectly, with his Private Information, including his name, address, phone number, and other sensitive information. Additionally, this Private Information may also include Plaintiff Day's medical records.

210.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Day's Private Information in its system.

211.    Plaintiff Day is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

212.    Plaintiff Day received the Notice Letter, by U.S. mail, directly from Defendant, dated December 20, 2023, informing him that his Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach.

213.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff Day to "remain vigilant and to regularly review and monitor relevant account statements and credit reports and report suspected incidents of identity theft to local law enforcement, your state's Attorney General, or the Federal Trade Commission[,]" Plaintiff Day made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:

researching and verifying the legitimacy of the Data Breach, communicating with his financial and insurance services providers to alert them of the breach and learn more about precautions he can take, and changing account passwords for all of his accounts tied to sensitive personal information. Further, Plaintiff Day has spent significant uncompensated time on activities in response to the Data Breach—Plaintiff Day checks his accounts weekly, and he has spent an additional two hours reviewing bank statements and financial accounts for fraudulent charges, as a direct result of the Data Breach. Thus, this is valuable time that Plaintiff Day otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

214.    Plaintiff Day suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the present and continuing risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

215.    As a result of the Data Breach, Plaintiff Day anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

216.   As a result of the Data Breach, Plaintiff Day is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

217.   Plaintiff Day has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

218.   Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

### Nationwide Class

All persons residing in the United States whose Private Information was compromised during the Data Breach that is the subject of the Notice Letter published by Defendant in December 2023, including all those who received the Notice Letter (the "Class").

219.   Additionally, Plaintiff Simpson seeks to represent the following Florida Subclass, defined as:

### Florida Subclass

All persons in the State of Florida whose Private Information was compromised during the Data Breach that is the subject of the Notice Letter published by Defendant in December 2023, including all those who received the Notice Letter (the "Florida Subclass").

220.   Additionally, Plaintiffs Love and Thomas seek to represent the following North Carolina Subclass, defined as:

### North Carolina Subclass

All persons in the State of North Carolina whose Private Information was compromised during the Data Breach that is the subject of the Notice Letter published by Defendant in December 2023, including all those who received the Notice Letter (the "North Carolina Subclass").

221.   Additionally, Plaintiff Guiffre seeks to represent the following New York Subclass, defined as:

**New York Subclass**
All persons in the State of New York whose Private Information was compromised during the Data Breach that is the subject of the Notice Letter published by Defendant in December 2023, including all those who received the Notice Letter (the "New York Subclass").

222.    Excluded from the Class and Subclasses are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class and Subclasses are members of the judiciary to whom this case is assigned, their families and members of their staff.

223.    Plaintiffs hereby reserve the right to amend or modify the Class and/or Florida and/or North Carolina and/or New York Subclasses definitions with greater specificity or division after having had an opportunity to conduct discovery.

224.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, according to the reports submitted to the Office of the Maine Attorney General, approximately 2,700,000 persons were impacted in the Data Breach.[58]

225.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

---

[58] https://apps.web.maine.gov/online/aeviewer/ME/40/bd939a31-70fd-4f7c-99cf-d6b87906489f.shtml

b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k.  Whether Defendant breached implied contracts for adequate data security with Plaintiffs and Class Members;

l.  Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Plaintiffs and Class Members;

m. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and,

n. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

226.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

227.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

228.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

229.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for

Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

230.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

231.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

  a.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

  b.  Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

  c.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

  d.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

  e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

232.     Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice Letters by Defendant.

## COUNT I
### Negligence
### (On behalf of Plaintiffs and the Class)

233.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraph 1 through 232 as if fully set forth herein.

234.     Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

235.     Plaintiffs and Class Members entrusted Defendant with their Private Information with the implicit understanding that Defendant would safeguard their information.

236.     Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

237.     By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

238.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

239.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

240.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiffs or Class Members of the Data Breach until December 12, 2023, despite, upon information and belief, Defendant knowing shortly after September 28, 2023, that unauthorized persons had accessed and acquired the Private Information of Plaintiffs and the Class.

241.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

242.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its clients' patients. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of being patients of Defendant's clients.

243.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

244.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

245.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former patients' Private Information it was no longer required to retain pursuant to regulations.

246.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

247.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

248.    Defendant breached its duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.   Failing to adequately monitor the security of their networks and systems;

    c.   Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d.   Allowing unauthorized access to Class Members' Private Information;

    e.   Failing to detect in a timely manner that Class Members' Private Information had been compromised;

    f.   Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations; and

    g.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

249.    Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

250.    Plaintiffs and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

251.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

252.    Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

253.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

254.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

255.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the software industry.

256.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

257.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

258.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Plaintiffs and Class Members.

259.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

260.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

261.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

262.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

263.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

264.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

265.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to

mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the present and continuing risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

266.   As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

267.   Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

268.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

269.   Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

270.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence Per Se
### (On behalf of Plaintiffs and the Class)

271.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein.

272.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information

273.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

274.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiffs or Class Members of the Data Breach until December 12, 2023 despite, upon information and belief, Defendant knowing shortly after September 28, 2023 that unauthorized persons had accessed and acquired the private, protected, personal information of Plaintiffs and the Class.

275.    Defendant breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

276.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

277.    But for Defendant's wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

278.    The harm resulting from the Data Breach was the harm the FTC Act and HIPAA were intended to guard against, and Plaintiffs and Class Members are within the class of persons the statute was intended to protect.

279.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

280.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT III**
**Breach of Third-Party Beneficiary Contract**
**(On behalf of Plaintiffs and the Class)**

281.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein.

282.    Upon information and belief, Defendant entered into virtually identical contracts with its clients to provide software products and/or services, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

283.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services.

Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

284.    Defendant knew that if they were to breach these contracts with its clients, Plaintiffs and the Class would be harmed.

285.    Defendant breached its contracts with its clients and, as a result, Plaintiffs and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

286.    As foreseen, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

287.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## COUNT IV
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

288.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein.

289.    Plaintiffs bring this claim in the alternative to their breach of third-party beneficiary contract claim above.

290.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Defendant should have provided adequate data security for Plaintiffs' and Class Members'.

291.    Defendant knew that Plaintiffs and Class Members conferred a benefit on it in the form of their Private Information as a necessary part of their receiving healthcare services at Defendant's clients. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

292.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiffs and Class Members.

293.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

294.    Defendant, however, failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

295.    Defendant would not be able to carry out an essential function of its regular business without the Private Information of Plaintiffs and Class Members and derived revenue by using it for business purposes. Plaintiffs and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

296.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

297.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

298.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

299.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

300.   Plaintiffs and Class Members have no adequate remedy at law.

301.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

302.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

303.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT V**
**Declaratory Judgment and Injunctive Relief**
**(On behalf of Plaintiffs and the Class)**

304.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein.

305.    Plaintiffs pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

306.    Defendant owes a duty of care to Plaintiffs and the Class that require it to adequately secure Plaintiffs' and Class Members' Personal Information.

307.    Defendant failed to fulfill their duty of care to safeguard Plaintiffs' and Class Members' Personal Information.

308.    Plaintiffs and the Class are at risk of harm due to the exposure of their Personal Information and Defendant's failure to address the security failings that lead to such exposure.

309.    Plaintiffs, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with their explicit or implicit

contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h. Meaningfully educating Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## COUNT VI
**Violation of the Florida Deceptive and Unfair Trade Practices Act
Fla. Stat. §§ 501.201, *et seq.*
(On behalf of Plaintiff Simpson and the Florida Subclass)**

310.     Plaintiff Simpson (for the purposes of this Count, "Plaintiff") re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein, and brings this count on behalf of himself and the Florida Subclass (the "Class" for the purposes of this Count).

311.     Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce. Mainly, Defendant obtained Plaintiff's and Class Members' Private Information through advertising, soliciting, providing, offering, and/or distributing goods and services to its clients (of which Plaintiff and Class Members are, or were, patients) and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

312.     As alleged in this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

   a. failure to implement adequate data security practices to safeguard its clients' patients' Private Information;

   b. failure to make only authorized disclosures of its clients' current and former patients' Private Information;

   c. failure to disclose that their data security practices were inadequate to safeguard Private Information from theft; and

   d. failure to timely and accurately disclose the Data Breach to Plaintiff and Class Members.

313.     Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and

unscrupulous activities that are and were substantially injurious to Defendant's clients' current and former patients.

314.    In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices by omitting, failing to disclose, or inadequately disclosing to Defendant's clients' current and former patients that they did not follow industry best practices for the collection, use, and storage of Private Information.

315.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been harmed and have suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) Plaintiff experiencing fraudulent charges to his Chase bank credit card, in or about December 2023; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

316.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff and Class Members have been damaged and are entitled to recover an order providing declaratory and injunctive relief and reasonable attorneys' fees and costs, to the extent permitted by law.

317.    Also, as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff and Class Members are entitled to injunctive relief, including, but not limited to:

a.  Ordering that Defendant implement measures that ensure that the Private Information of Defendant's clients' current and former patients is appropriately encrypted and safeguarded when stored on Defendant's network or systems;

b.  Ordering that Defendant purge, delete, and destroy in a reasonable secure manner Private Information not necessary for their provision of services;

c.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

d.  Ordering Defendant to meaningfully educate its clients' current and former patients about the threats they face as a result of the accessibility of their Private Information to third parties, as well as the steps Defendant's clients' current and former patients must take to protect themselves.

**COUNT VII**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. Ann. § 75-1.1, *et seq.***
**(On behalf of the Plaintiffs Love and Thomas and the North Carolina Subclass)**

318.    Plaintiffs Love and Thomas (for the purposes of this Count, "Plaintiffs") re-allege and incorporate by reference the allegations contained in paragraphs 1 through 232 as if fully set forth herein, and brings this Count on behalf of themselves and the North Carolina Subclass (the "Class" for the purposes of this Count).

319. Defendant engaged in unfair and deceptive acts or practices in or affecting commerce, in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. Ann. § 75-1.1, including:

   a. Failing to implement and maintain reasonable security and privacy measures to protect its client's patients Private Information, which was a direct and proximate cause of the Data Breach;

   b. Failing to identify and remediate foreseeable security and privacy risks and adequately maintain security and privacy measures despite knowing the risk disclosure of patients' Private Information, which was a direct and proximate cause of the Data Breach;

   c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.102 and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Privacy Breach;

   d. Misrepresenting that it would protect the privacy and confidentiality of its client's patients Personal Information, including by implementing and maintaining reasonable security measures;

   e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Class's Private Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.102;

   f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and the Class's Private Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Class's Private Information, including duties imposed by HIPAA, 45 C.F.R. § 160.102 or the FTC Act, 15 U.S.C. § 45.

320.    Section 16 of the NUDTPA provides a private right of action for consumers, stating:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen. Stat. Ann. § 75-16.

321.    Defendant's acts and practices were "unfair" because they caused or were likely to cause substantial injury to their client's patients which was not reasonably avoidable by patients themselves and not outweighed by countervailing benefits to patients or to competition.

322.    Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect confidentiality of their clients' patients Private Information.

323.    The injury to patients from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their Private Information.

324.    Plaintiffs and the Class could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of patient healthcare decision-making. By withholding important information

from its client's patients about the inadequacy of its data security, Defendant created an asymmetry of information between it and patients that precluded patients from taking action to avoid or mitigate injury.

325.    Had Defendant disclosed to Plaintiffs and Class Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the Personal Information that Plaintiffs and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

326.    Defendant acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiffs' and Class Members' rights.

327.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiffs and the Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; fear, anxiety and worry about the status of the Private Information; receiving unwanted advertisements that reveal treatments for specific medical conditions; and the value of identity protection services made necessary by the Data Breach.

328. Defendant's conduct as alleged herein was continuous, such that after the first violations of the previous pled herein, each week that the violations continued constitute separate offenses under N.C. Gen. Stat. Ann. § 75-8.

329. Plaintiffs and the Class seek all relief allowed by law, including actual damages, treble damages, reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

## COUNT VIII
### Violation Of The New York Deceptive Trade Practices Act ("GBL")
### New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff Guiffre and the New York Subclass)

330. Plaintiff Guiffre (for the purposes of this Count, "Plaintiff") re-alleges and incorporates by reference the allegations contained in paragraph 1 through 232 as if fully set forth herein, and brings this Count on behalf of himself and the New York Subclass (the "Class" for the purposes of this Count).

331. Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a), including, but not limited to, the following:

    a. Misrepresenting material facts to its clients' patients (including Plaintiff and the Class) by representing that they would maintain adequate data privacy and security practices and procedures to safeguard the Class's Private Information from unauthorized disclosure, release, data breaches, and theft;

    b. Misrepresenting material facts to its clients' patients (including Plaintiff and the Class) by representing that they did and would comply with the requirements of federal and state laws pertaining to the privacy and security of the Class's Private Information;

    c.   Omitting, suppressing, and/or concealing material facts of the inadequacy of its privacy and security protections for the Class's Private Information;

    d.   Engaging in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of the Class's Private Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws; and,

    e.   Engaging in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Data Breach to the Class in a timely and accurate manner, contrary to the duties imposed by N.Y. Gen. Bus. Law § 899-aa(2).

332.    Defendant knew or should have known that its network and data security practices were inadequate to safeguard the Class's Private Information entrusted to it, and that risk of a data breach or theft was highly likely.

333.    Defendant should have disclosed this information because Defendant was in a superior position to know the true facts related to the defective data security.

334.    Defendant's failure constitutes false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and the Class) regarding the security of Defendant's network and aggregation of Private Information.

335.    The representations upon which its clients' current and former patients (including Plaintiff and the Class) relied were material representations (e.g., as to Defendant's adequate protection of Private Information), and Plaintiff and New York Subclass Members relied on those representations to their detriment.

336.    Defendant's conduct is unconscionable, deceptive, and unfair, as it is likely to, and did, mislead consumers acting reasonably under the circumstances. As a direct and proximate

result of Defendant's conduct, Plaintiff and the Class have been harmed, in that they were not timely notified of the Data Breach, which resulted in profound vulnerability to their personal information and other financial accounts.

337.    Defendant knew or should have known that their computer systems and data security practices were inadequate to safeguard the Class's Private Information and that the risk of a data security incident was high.

338.    Defendant's acts, practices, and omissions were done in the course of Defendant's business of furnishing software services to hospital and healthcare systems who serve consumers in the State of New York.

339.    As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and omissions, Plaintiff's and the Class's Private Information was disclosed to third parties without authorization, causing and will continue to cause Plaintiff and the Class damages.

340.    Plaintiff and the Class were injured because:

a.    Plaintiff and the Class would not have paid Defendant's clients for services had they known the true nature and character of Defendant's data security practices;

b.    Plaintiff and the Class would not have entrusted their Private Information to Defendant's clients in the absence of promises, explicit or implicit, that Defendant would keep their information reasonably secure, and

c.    Plaintiff and the Class would not have entrusted their Private Information to Defendants clients in the absence of the promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

341.    As a direct and proximate result of Defendant's multiple, separate violations of GBL §349, Plaintiff and the Class suffered damages including, but not limited to: (i) invasion of

privacy; (ii) loss of benefit of the bargain; (iii) lost time, spent on activities remedying harms resulting from the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (v) the present and continuing risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

342.    As a result, Plaintiff and the Class have been damaged in an amount to be proven at trial.

343.    Plaintiff brings this action on behalf of himself and the Class for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, the Class and the public from Defendant's unfair, deceptive, and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

344.    Plaintiff and the Class seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorneys' fees and costs.

345.    On behalf of himself and other members of the Class, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class and Subclasses;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality

and integrity of the Private Information of Plaintiffs and Class Members;

v.      prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.     requiring Defendant to conduct regular database scanning and security checks;

x.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling

personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.  requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury on all triable issues.

Dated: February 8, 2024

Respectfully submitted,

Bryan L. Bleichner*
Philip J. Krzeski*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South
Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
Facsimile: (612)-336-2940
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN LLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
T: (865) 247-0080
F: (865) 522-0049
*gklinger@milberg.com*

John A. Yanchunis
**MORGAN & MORGAN COMPLEX**
**LITIGATION GROUP**
Texas Bar No. 22121300
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 318-5189
Facsimile: (813) 222-2496
*jyanchunis@forthepeople.com*

*Interim Class Counsel for Plaintiffs and the Proposed
Class*

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000
214-744-3015 (Facsimile)
*jkendall@kendalllawgroup.com*

Bruce W. Steckler
Texas Bar No. 00785039
Paul D. Stickney, Of Counsel
Texas Bar No. 00789924
**STECKLER WAYNE & LOVE, PLLC**
12720 Hillcrest Rd., Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
*bruce@swclaw.com*
*judgestick@gmail.com*

*Texas Local Counsel for Plaintiffs and the Proposed
Class*
*Admitted Pro Hac Vice